**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

PAUL BISCHOFF,

               Plaintiff,

v.                                                                    Case No.: 3:23-cv-1303-WWB-MCR

DENIS MCDONOUGH,

               Defendant.

_____/

## ORDER

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Doc. 26), Plaintiff's Response (Doc. 33), Defendant's Reply (Doc. 34), and Plaintiff's Surreply (Doc. 44).  For the reasons set forth below, Defendant's Motion will be granted.

## I.   BACKGROUND

Plaintiff Paul Bischoff ("**Bischoff**"), now a 64-year-old veteran, began working as a boiler operator in 1995.  (Doc. 30-7 at 2).  In 2015, he transferred to the Veteran Affairs Hospital in Lake City, Florida, to work as a Utility Systems Repair Operator ("**USRO**").  (*Id.*).  Like in his previous role, Bischoff maintained boiler systems, the fire system, and the medical air.  (*Id.*; Doc. 30-8 at 27:3–10, 29:11–12).  Bischoff was known as a good worker.  (*E.g.*, Doc. 30-9 at 59:23–24 ("I call [Bischoff] because he could fix anything."); *see also* Doc. 30-10 at 10:9–11:8).  Initially, when Bischoff began at the Hospital, the supervisor position was periodically vacant.  (Doc. 30-8 at 34:2–19, 35:4–9).  However, in 2021, Robert Farmer became Maintenance Operations Supervisor.  (Doc. 30-7 at 3).  Conflict then erupted between Farmer and the USROs he was tasked with "squar[ing] away."  (Doc. 30-9 at 12:5; *see also, e.g.*, Doc. 30-10 at 12:19–23).  At age 60, Bischoff

was then the oldest USRO among himself, Monroe Jackson (59), Kent Hassebroek (58) and Tim Moore (54).  (Doc. 30-7 at 3–4; Doc. 30-8 at 138:3–7).

In December 2021, Jackson was detailed from the boiler plant to Environmental Management Services ("**EMS**"), where he performed housekeeping duties.  (Doc. 30-7 at 3; Doc. 30-8 at 53:11–18; Doc. 30-15 at 12:1–13).  According to testimony, this occurred after Jackson "caught" Farmer breaking a feed pump that Jackson and another USRO were attempting to repair, and "[Farmer] tried to blame [Jackson and his co-worker] for [it]." (Doc. 30-9 at 16:18–19).  Farmer then hired two younger USROs—Mitch Wilson (55) and Ricky Bell (55).  (Doc. 30-7 at 3–4; Doc. 30-8 at 53:14–20, 138:5–7).

After Jackson's detail, Farmer and Bischoff's relationship was contentious; Bischoff and other USROs testified that Farmer targeted Bischoff.  (Doc. 30-8 at 78:2–5; Doc. 30-9 at 25:20–22; Doc. 30-11 at 24:14–25).  On some occasions, Farmer would instruct Bischoff to complete tasks but then discipline Bischoff for doing so.  For example, Bischoff and Wilson were told to dispose of parts they did not use.  (Doc. 30-7 at 4; Doc. 30-11 at 23:15–19).  In doing so, they disposed of an old calibration tool with missing parts, and Farmer appeared to blame the disposal on Bischoff.  (Doc. 30-11 at 23:17–25).  Though Wilson accepted blame for the incident, Bischoff was written up for a failure to follow instructions.  (Doc. 30-1 at 2; Doc. 30-7 at 4–5; Doc. 30-11 at 23:24–24:8).

On other occasions, Bischoff was assigned unsafe tasks, such as moving 400 to 500-pound equipment by himself or improperly applying anti-seize lubricant to valves twenty feet in the air.  (Doc. 30-9 at 32:22–33:22, 51:2–52:9; Doc. 30-18 at 7–8, 59).

2

Sometimes Bischoff was reported for refusing to complete the tasks. (Doc. 30-1 at 2).[1] Farmer also assigned Bischoff tasks that were impossible to complete, such as locating monthly boiler reports that, according to testimony, did not exist because Farmer never scheduled the testing. (Doc. 30-8 at 79:12–81:13; Doc. 30-9 at 54:6–7; Doc. 30-16 at 7–9, 13). Farmer asked Bischoff to explain why he could not locate the reports. (Doc. 30-16 at 9, 11). It appears that Bischoff, rather than explaining that the reports did not exist, simply told Farmer that he had already looked and refused to look any further. (*Id.* at 2–9; Doc. 30:8 at 80:24–81:6). In any event, Bischoff was written up for failing to follow instructions. (Doc. 30-1 at 2; Doc. 30-7 at 6–7).

On May 22, 2022, Bischoff received a "fully successful" performance evaluation, in contrast to his prior "outstanding" ratings. (Doc. 30-7 at 6; Doc. 30-28 at 6, 14, 22). Bischoff claims this made him "ineligible for the annual bonus which could amount to $4,000" and "limit[ed him] to a $500 bonus." (Doc. 30-7 at 6).[2] Around July 2022, Bischoff complained to Farmer's supervisor, Danny Dwyer, that Farmer was "trying to force [him] out" based on his age. (Doc. 30-8 at 71:12–17). Dwyer disputes Bischoff contacting him. (Doc. 30-13 at 23:25–24:19). In September 2022, Bischoff contacted an EEO counselor to report age discrimination. (Doc. 30-7 at 11; Doc. 36-2 at 3). Other incidents continued. (*E.g.*, Doc. 30-9 at 57:25–58:3 ("[Farmer] would come down to the boiler plant and he

---

[1] In his Response, Bischoff states that his refusal to move the heavy equipment was written up as an act of "insubordination." (Doc. 33 at 3). However, the Court cannot locate this incident in the exhibit that Bischoff cites. (*See* Doc. 30-1).

[2] Bischoff has not put forth evidence demonstrating that an "outstanding" employee receives a $4,000 bonus. Defendant contests the bonus's existence as well as its award to Bischoff. (Doc. 26 at 17–18). Rather, Defendant claims that Bischoff received a cash award no greater than $3,500, which itself was awarded only once. (*Id.*; *see also* Doc. 28-4 at 2).

would take something . . . up to the chiller plant.  And then he will tell [Bischoff] to look for it.")).

On October 11, 2022, Bischoff was detailed to EMS pending a disciplinary investigation into him for "alleged incidents of possible intentional damage of VA equipment, harassment in the workplace, [and] failure to follow instructions."  (Doc 30-2 at 2; *see also* Doc. 30-8 at 88:15–90:1; Doc. 30-14 at 29:22–30:8, 80:10–83:24).  According to testimony, Dwyer and his superiors made the decision to detail Bischoff.  (Doc. 30-13 at 33:4–8; Doc. 30-14 at 30:1–4).  The pieces of equipment in question were, primarily, two emergency sump pumps, which "ha[d] always been" a "huge problem" at the plant, and also an LED light that Bischoff had painted without permission.[3]  (Doc. 30-10 at 19:25–20:1; *see also* Doc. 30-11 at 18:7–12; Doc. 30-14 at 30:5–10, 44:2–5).  According to Farmer, the pumps had been taken out of the water on Bischoff's shift, which could have destroyed their motors, caused flooding, and shut down the entire plant.  (Doc. 30-14 at 81:8–83:9).  One USRO called this "ridiculous" and testified that the pumps had to be pulled out of the water to be de-clogged.  (Doc. 30-9 at 66:20–67:19).  Another testified that the plant went "through pumps left and right" because they would frequently clog and draw too much electricity and "just wouldn't . . . work at all."  (Doc. 30-11 at 18:11–12, 27:21–22; *see also id.* at 15:20–16:3, 18:7–10).  Conversely, Dwyer and Farmer testified that the pumps' electrical problems had been remedied by the time of the

---

[3] As for the LED light, Bischoff testified that Farmer ratified his paint job after the fact.  (Doc. 30-8 at 85:1–12).  He claimed the same in an e-mail sent to Farmer, also after the fact, though Farmer quickly denied the claim.  (Doc. 30-6 at 8–9).  Nonetheless, it is uncontested that Bischoff painted the light without first obtaining permission.

4

incident, though Farmer admits the pumps were inadequate. (Doc. 30-13 at 26:25–27:4; Doc. 30-14 at 56:18–57:15, 66:8–13).

Bischoff remained on detail for two years while Dwyer conducted the investigation. (Doc. 30-8 at 90:2–6; Doc. 30-13 at 40:4–9). During that time, he requested a transfer to the Gainesville VA Boiler Plant, but Dwyer informed him that he could not be transferred while his investigation was underway. (Doc. 30-8 at 102:14–103:8; Doc. 30-18 at 56–57). Meanwhile, Bischoff was unable to work overtime and primarily assembled furniture. (Doc. 30-7 at 12; Doc. 30-8 at 113:17–24). While Dwyer and another individual conducted the investigation, Farmer hired two "considerably younger" employees in Bischoff's stead. (Doc. 30-14 at 64:10–19). One USRO testified that Farmer's "phony" long worklists, in which he would single Bischoff out, "stopped as soon as they detailed him out of the[ boiler plant]." (Doc. 30-9 at 61:25–62:2). On December 14, 2022, Bischoff filed an EEOC complaint for age discrimination, harassment, hostile work environment, workplace bullying, and unsafe work practices. (Doc. 36-2 at 3). According to Bischoff, his union representative received an offer to end his investigation and transfer him back to the boiler plant if Bischoff "agreed to drop [his] EEO complaint." (Doc. 30-7 at 14). Farmer denies knowledge of the alleged offer. (Doc. 30-14 at 69:13–17).

On November 2, 2023, Bischoff brought claims for discrimination (Count I) and retaliation (Count II) in violation of the Age Discrimination in Employment Act ("**ADEA**"), 29 U.S.C. § 623, against Denis McDonough, then the Secretary of Veteran Affairs.[4] (Doc.

---

[4] Plaintiff brings suit against Denis McDonough, who was the Secretary of the Department of Veteran Affairs at the time of filing. Under Federal Rule of Civil Procedure 25(d), Douglas A. Collins was "automatically substituted" as Defendant when he replaced McDonough as Secretary.

1, ¶¶ 58–72).    Defendant's investigation into Bischoff continued, and eventually, investigation findings recommended Bischoff be suspended for two-weeks.  (Doc. 30-3 at 2).  Bischoff did not amend his Complaint (Doc. 1) to include allegations pertaining to the suspension.  Defendant now moves for summary judgment on Bischoff's claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Id.*  "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007).  Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quotation omitted).  The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts."  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  Nevertheless, "[i]f there is a conflict between the parties' allegations or

6

evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor."  *Allen*, 495 F.3d at 1314.

III.    **DISCUSSION**

Defendant argues summary judgment is warranted because Bischoff did not exhaust his administrative remedies and cannot establish a prima facie case for his claims of ADEA discrimination and retaliation.  Specifically, as to Count I, Defendant argues that Bischoff cannot establish a prima facie case of discrimination, i.e., age-based disparate treatment.  (*See* Doc. 26 at 11 (citing *Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858, 865–66 (11th Cir. 2025))).  The Court notes that Count I, though titled broadly as an "[a]ge [d]iscrimination" claim, contains allegations pertaining to both a disparate treatment claim and a hostile work environment claim.  (Doc. 1, ¶¶ 1–63).  Likewise, Bischoff's EEOC complaint was eventually distilled into a hostile work environment claim supported by eleven separate incidents, three of which co-served as disparate treatment claims.  (Doc. 30-22 at 4 & n.2).  Unsurprisingly, the complaint's foundational factual allegations seem to support either claim or both.  (Doc. 36-2 at 3–5).  Yet, in his Response to Defendant's Motion, Bischoff argues that he was treated "differently than [his] younger coworkers," suffering "adverse employment action" and "personnel actions" "tainted" by age discrimination.  (Doc. 33 at 10–11,14; *see also id.* at 12–13; Doc. 44 at 2–7).  As would be relevant to a hostile work environment claim, Bischoff's allegations of hostility and harassment now appear to provide circumstantial evidence of Defendant's discriminatory intent to treat Bischoff differently.  (*See* Doc. 33 at 13–14).  Likewise, his specific allegations of an abusive work environment and mistreatment that was sufficient to alter the terms and conditions of his employment appear to have been abandoned.  (*See*

7

*generally id.*; *cf.* Doc. 1, ¶¶ 61, 63); *see Terrell v. Sec'y, Dep't of Veterans Affs.*, 98 F.4th 1343, 1356 (11th Cir. 2024) (discussing abandonment). In other words, Bischoff accepts Defendant's framing of Count I as a disparate treatment claim and defends the claim as such. *Cf. Babb v. Sec'y, Dep't of Veterans Affs.* ("**Babb II**"), 992 F.3d 1193, 1206–07 (11th Cir. 2021) (delineating types of discrimination claims as defined by *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860–62 (11th Cir. 2020)).

"[A] plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013). Here, however, Count I of Bischoff's Complaint plausibly alleges either a disparate treatment claim, a hostile work environment claim, or both. Therefore, noting that disparate treatment and hostile work environment are distinct claims that should be pleaded in separate counts, the Court accepts the parties' treatment of Count I as a disparate treatment claim. *See Jimenez v. U.S. Att'y Gen.*, 146 F.4th 972, 994 n.6 (11th Cir. 2025) (addressing claim under similar circumstances); *cf. Monaghan*, 955 F.3d at 859 (declining to address claims that were argued at summary judgment but not supported by the complaint's allegations); *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (stating that, at summary judgment, "the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned" (citation omitted)).

## A. Administrative Exhaustion

Bischoff contacted the EEO counselor on September 1, 2022, (Doc. 30-7 at 11), and filed an EEOC Complaint on December 14, 2022, (Doc. 36-2 at 3). Defendant argues

8

that any discriminatory actions Bischoff alleges prior to July 18, 2022, are time-barred by 29 C.F.R. § 1614.105(a)(1), which provides that "[a]n aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." Bischoff responds that the actions complained of prior to July 18, 2022, are part of a continuing violation not subject to § 1614.105(a)(1)'s forty-five day cutoff.

"Before a federal civil servant can sue his employer for violating [the ADEA], he must, among other things, initiate contact with an Equal Employment Opportunity counselor at his agency within 45 days of the date of the matter alleged to be discriminatory." *Green v. Brennan*, 578 U.S. 547, 549–50 (2016) (quotation omitted). "Generally, when the claimant does not initiate contact within the 45–day charging period, the claim is barred for failure to exhaust administrative remedies." *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008). In some instances, however, "[t]he continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Ctr. For Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006) (citation omitted). This occurs "if the defendant's actions violate a plaintiff's rights on a repeated or ongoing basis," such that the actions constitute "a single violation of an ongoing nature." *Jimenez*, 146 F.4th at 992 (quotations omitted). But the doctrine does not apply to "a series of repeated violations that result in related harms," *id.* (quotation omitted), nor "does [it] apply to discrete acts of discrimination." *Brooks v. CSX Transp., Inc.*, 555 F. App'x 878, 880 (11th Cir. 2014). Therefore, "[t]he continuing violation doctrine cannot convert related discrete acts into a single unlawful practice for the purposes of timely filing. Instead, when an employee

9

alleges serial violations, *i.e.,* a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation." *Jimenez*, 146 F.4th at 992 (citations and quotation marks omitted); *see also Burns v. Sec'y, Dep't of Homeland Sec., Transp. Sec. Admin.*, No. 6:22-cv-1599, 2024 WL 4803202, at *5 (M.D. Fla. Nov. 15, 2024). Individual acts of discriminatory disparate treatment or retaliation thus do not fall within the scope of the continuing-violation doctrine, which has been "essentially rejected" outside of hostile work environment claims, as they are "continuing by their very nature". *Jimenez*, 146 F.4th at 993 (quotations omitted); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14, 117 (2002); *Villarreal v. R.J. Reynolds Tobacco Co.*, 702 F. App'x 797, 799 (11th Cir. 2017) ("[Plaintiff's] disparate treatment claim does not fall within the scope of the continuing-violation doctrine."). Accordingly, discriminatory acts alleged to have occurred before July 18, 2022—including Bischoff's receiving a slightly downrated performance evaluation, an assignment to move heavy equipment, and a reprimand for discarding a calibration tool—are not actionable here. (*See* Doc. 30-7 at 4, 6; Doc. 30-9 at 51:2–6; Doc. 30-18 at 59). At most, they may provide "background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113.

Defendant also argues that Bischoff impermissibly asserted new allegations of discriminatory and retaliatory conduct—allegations that he failed to include in his EEOC and judicial Complaints—at the summary judgment stage. Specifically, Defendant claims that allegations pertaining to Bischoff's suspension, disciplinary investigation, and delayed transfer request are not properly before the Court and should not be considered. Bischoff argues that these allegations are properly before the Court because they concern conduct that grew out of his EEOC Complaint and constituted a continuing violation.

10

Bischoff also seems to argue that being barred from overtime pay, which was not specifically alleged in his judicial Complaint, was an independently actionable act of discrimination or retaliation.

Because of the ADEA's exhaustion requirement, "a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (quotation omitted). "The facts alleged in the charge matter most for determining what can reasonably be expected to grow out of an EEOC charge; the legal theory the charging party articulates is far less important." *Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1345 (11th Cir. 2022). Judicial claims that "amplify, clarify, or more clearly focus" the factual allegations in an EEOC complaint are fairly regarded as growing out the complaint. *Gregory*, 355 F.3d at 1279 (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)). Judicial claims that allege new acts of discrimination or retaliation are barred for failure to exhaust. *Id.* at 1279–80; *see also Horace v. ARIA*, No. 23-12414, 2024 WL 1174398, at *2–3 (11th Cir. Mar. 19, 2024).

Relatedly, and to repeat, "a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." *Miccosukee Tribe*, 716 F.3d at 559. Nor may a Plaintiff "raise a new theory of liability based on unpleaded factual predicates in support of an already pleaded claim." *Ibeh v. Wilson*, No. 23-13128, 2024 WL 2723253, at *2 (11th Cir. May 28, 2024) (citing *Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017)). Rather, "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint

11

in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

Here, Bischoff's judicial Complaint included allegations relating to his disciplinary investigation, the prolonged nature of which effectively "waitlisted" his transfer request. (Doc. 1, ¶ 54; *see also id.* ¶ 56 ("Defendant has failed to timely conclude the investigation into Plaintiff's alleged acts.")).  Bischoff's EEOC complaint, however, only complained of his detail to EMS.  (Doc. 36-2 at 3, 65).  But Defendant's investigation into Bischoff and Bischoff's detail to EMS are simply two sides of the same coin.  When the VA investigates an employee for damaging government property, its policies allow for, but do not require, that employee's detail to another department.  (Doc. 28-4 at 3).  The Court is therefore cognizant of the fact that Defendant's decision to investigate Bischoff was not necessarily the same decision it took to put him on detail to EMS.  Still, Bischoff was detailed to EMS because of "alleged incidents of possible intentional damage of VA equipment . . . and additional misconduct." (Doc. 30-2 at 2; *see also, e.g.*, Doc. 30-14 at 30:5–10).  Bischoff's detail letter stated that his assignment to EMS would "continue until the investigation into th[ese] matter[s had] concluded."  (Doc. 30-2 at 2).  And, most importantly for present purposes, the EEOC's interim investigative report and final agency decision acknowledged testimony stating that Bischoff was detailed to EMS because of his pending disciplinary investigation. (Doc. 30-22 at 10, 13; Doc. 36-2 at 77).  Both Farmer and Dwyer confirmed that was the case in their testimony.  (Doc. 30-13 at 33:4–8; Doc. 30-14 at 30:5–10).   Bischoff's judicial allegations of a discriminatory disciplinary investigation are thus "inextricably intertwined" with his earlier allegations of a discriminatory detail transfer.  *Gregory*, 355 F.3d at 1280.  Accordingly, the Court will

assume that Bischoff administratively exhausted his claims to the extent they rely on Defendant's disciplinary investigation. However, because Bischoff does not differentiate between the two acts with respect to evidence or arguments presented, the Court will analyze Bischoff's investigation and detail together.

Bischoff's allegations of a waitlisted transfer request are not similarly situated. Rather than merely amplifying and focusing his previous allegations of a discriminatory detail transfer caused by Defendant's investigation, Bischoff's allegations of delay and waitlisting raise a new complaint of a new incident that, by its nature, could have only followed Bischoff's request for a transfer, which occurred over a month after the EEOC issued its investigatory findings. (*See* Doc. 30-8 at 102:14–103:8; Doc. 30-18 at 56–57; Doc. 36-2 at 78). Neither those findings, nor the EEOC's final decision, nor Bischoff's EEOC complaint made any mention of his transfer request or its alleged subsequent delay. (*See* Doc. Nos. 36-2–36-4). Thus, a reasonable EEOC officer would have no basis to inquire into the allegation or even imagine that it had occurred. *Cf. Gregory*, 355 F.3d at 1280. Bischoff therefore failed to administratively exhaust his claims to the extent they rest upon the alleged untimeliness of his investigation. He attempts to resuscitate his retaliation claim by arguing that administrative exhaustion is unnecessary under *Gupta v. E. Tex. State Univ.*, 654 F.2d 411 (5th Cir. 1981). *See id.* at 414 ("[I]t is unnecessary . . . to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge . . . .").[5] He cannot. The precedential value of *Gupta* is spurious following the Supreme Court's holding in *Morgan* that "[e]ach incident of

---

[5] Decisions of the Fifth Circuit issued on or before September 30, 1981, are binding upon the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

13

discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" that must be administrative exhausted. 536 U.S. at 114. But even if *Gupta* remains valid, its exception applies only where the "the uncharged retaliatory conduct that the plaintiff alleged in his complaint occurred after the plaintiff filed suit in district court." *Ellison v. Postmaster Gen., USPS*, No. 20-13112, 2022 WL 4726121, at *8 (11th Cir. Oct. 3, 2022) (citing *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 893 (11th Cir. 2014)). Because Bischoff learned that his transfer request was "waitlisted" no less than four months before he filed his judicial Complaint, a *Gupta* exception provides him no refuge. (*See* Doc. 30-18 at 56 (informing Bischoff, on June 20, 2023, that he could not be transferred while his investigation was underway)).

Likewise, Bischoff's judicial Complaint was filed before his suspension and included no allegations relating thereto. For the purposes of administrative exhaustion, a suspension is an actionable, discrete act that "occur[s] on a[] particular day" and "starts a new clock for filing [EEOC] charges alleging that act." *Morgan*, 536 U.S. at 113, 115. Accordingly, the allegations relating to Bischoff's suspension raise a new claim that he cannot now assert. *See Jimenez*, 146 F.4th at 990 ("[W]e have repeatedly cautioned that allegations of new acts of discrimination are inappropriate." (quotation omitted)); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (approving district court's rejection of plaintiff's "assertion of an additional, separate statutory basis for entitlement" to FMLA leave at summary judgment). Moreover, and as already discussed, the continuing violation doctrine does not apply to independently actionable and discrete acts of discrimination. *See Morgan*, 536 U.S. at 113 ("Discrete

discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

Nor did Bischoff's judicial Complaint allege any acts relating to overtime pay. Bischoff's detail letter explicitly noted that he would be ineligible for "shift differential or premium pay" while his investigation was ongoing. (Doc. 30-2 at 2). Bischoff understood this language to prohibit overtime and holiday pay. (Doc. 30-8 at 113:25–114:6). But whether the prohibition was simply a term of his detail or an act of discrimination discrete from the detail itself, Bischoff's judicial Complaint failed to include allegations relating to it. Therefore, Bischoff cannot now raise being denied overtime as a basis for a claim for relief. *See Miccosukee Tribe*, 716 F.3d at 559.

The Court therefore proceeds to its analysis of Counts I and II without considering discriminatory acts alleged to have occurred before July 18, 2022, as independent bases for a claim. Nor will the Court consider as independent claims Bischoff's allegations and arguments pertaining to his suspension, overtime pay, or delayed transfer request.

## B. Discrimination

The ADEA prohibits age discrimination in personnel actions affecting federal employees. 29 U.S.C. § 633a(a). A federal employer violates the ADEA if it allows age discrimination "to contribute to any personnel action—even if the federal employer would have made precisely the same decision had it not engaged in [the] discrimination.'" *Rosado*, 127 F.4th at 865 (quoting *Buckley v. Sec'y of Army*, 97 F.4th 784, 793 (11th Cir. 2024)). In other words, "personnel actions must be made in 'a way that is not tainted by differential treatment based on' a protected characteristic." *Babb II*, 992 F.3d at 1199 (quoting *Babb v. Wilkie* ("**Babb I**"), 589 U.S. 399, 405 (2020)). Therefore, a federal

employee survives summary judgment on a disparate treatment claim if he can show "that [his] protected characteristic 'played *any* part' in the employer's decision-making process when the employer engaged in the challenged action." *Rosado*, 127 F.4th at 866 (quoting *Buckley*, 97 F.4th at 794). And he may show that his protected characteristic played a such a part "by presenting circumstantial evidence raising a reasonable inference of intentional discrimination by [his] employer." *Troupe v. DeJoy*, 861 F. App'x 291, 294 (11th Cir. 2021) (citation omitted). Federal employees are not, however, required to prove "that an employment decision would have turned out differently if [the protected basis] had not been taken into account.'"[6] *Rosado*, 127 F.4th at 865 (alteration in original) (quoting *Buckley*, 97 F.4th at 793). "[A]ge must be a but-for cause of discrimination—that is, of differential treatment—but not necessarily a but-for cause of a personnel action itself." *Babb I*, 589 U.S. at 406.

Here, the parties do not dispute that Bischoff's age, being over forty years, is a protected characteristic. And though Bischoff's Complaint and Response are not models of clarity, the personnel actions that he administratively exhausted, alleged in his Complaint, and argued in his Response appear limited to (1) being tasked with placing anti-seize on twenty-foot-high rising stem valves; (2) receiving a written counseling letter; and (3) his disciplinary investigation and corresponding detail to EMS. Defendant argues that these acts do not amount to adverse employment actions under *Muldrow v. City of*

---

[6] The Court notes that Defendant cites to *Rosado* as support for his claim that step one of the *McDonnell Douglas* framework is still required of federal employees seeking to survive summary judgment. (*See* Doc. 26 at 6–7). The *Rosado* court, however, reaffirmed the standard set forth above while merely assuming that a federal employee can defeat summary judgment by establishing a prima facie case. 127 F.4th at 866; *see also Jimenez*, 146 F.4th at 996. This Court assumes the same.

*St. Louis*, 601 U.S. 346 (2024).  Bischoff responds that *Muldrow* is inapposite because the universe of discriminatory personnel actions prohibited under § 633a(a) is much broader than the universe of discriminatory adverse employment actions prohibited by the non-federal-employer provisions within the ADEA and Title VII.  The Eleventh Circuit has not resolved the possible distinction, though it has acknowledged the Supreme Court's "assum[ption] that the term 'personnel actions' in § 633a(a) include[s] 'most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews.'"  *Babb II*, 992 F.3d at 1199 (quoting *Babb I*, 589 U.S. at 405); s*ee also Jimenez*, 146 F.4th at 995 n.7.

Assuming, too, that Bischoff challenges qualifying personnel actions, the Court turns to whether he has presented sufficient evidence that age discrimination played a role in the decision-making.  "That evidence may be direct, circumstantial, or both." *Jimenez*, 146 F.4th at 996.  But because Bischoff offers no direct evidence of age discrimination, he may either "present[] a prima facie case []or a convincing mosaic of circumstantial evidence that would 'reasonably allow for an inference that discrimination figured into the decision-making process' in any way."  *Id.* at 997 (quoting *Rosado*, 127 F.4th at 867).

A federal employee's prima facie case of ADEA discrimination must establish that the employer treated substantially younger but otherwise similarly situated employees more favorably.  *See Jimenez*, 146 F.4th at 996; *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298–99 (11th Cir. 2015).  To satisfy this burden, a plaintiff "must include meaningful comparator analysis," which "requires a showing that the plaintiff and his comparators are similarly situated in all material respects."  *Rosado*, 127 F.4th at 868

17

(quotation omitted).  Bischoff first disputes that he is required to engage in meaningful comparator analysis and later asserts that all USROs at the Lake City VA Hospital are valid comparators.  On the latter point, Bischoff argues that Mitch Wilson (55) and Ricky Bell (55), who fell within his protected class, were not assigned dangerous tasks and were not disciplined for failing to complete their tasks.  Bischoff then argues that Tim Moore (54) and Kent Hassebroek (58)—who also fell within his protected class—suffered age-based discrimination under Farmer.  Bischoff was 60 years old at the time.  While the Eleventh Circuit has held that a five-year age difference makes for a "substantially younger" comparator, *Liebman*, 808 F.3d at 1299 (collecting cases), Bischoff can hardly show that Defendant treated younger employees more favorably than him by arguing that a 54-year-old comparator suffered age-based discrimination while an older, 55-year-old comparator received age-based preferential treatment.

Of course, that is assuming that Wilson and Bell are otherwise proper comparators.  They are not.  A "similarly situated comparator typically will have engaged in the same basic conduct (or misconduct); be subject to the same employment policy, guideline, or rule; have the same supervisor(s); or share the plaintiff's employment or disciplinary history."  *Jimenez*, 146 F.4th at 996 (quotation marks omitted).  Here, no evidence suggests that Wilson or Bell ever refused to complete assignments, whereas Bischoff refused to complete assignments both safe and unsafe, both possible and impossible, and frequently challenged and argued with Farmer.  (*See* Doc. 30-8 at 75:20–25, 80:24–81:13, 82:19–83:10, 84:5–23; *see also generally* Doc. Nos. 30-16, 30-26, 30-27).  Other evidence confirms that Wilson and Bell's employment histories were grossly unsimilar to Bischoff's.  In fact, Bischoff admits that Wilson and Bell were inexperienced USROs that

18

still required his assistance and oversight even after he had administered their three months of qualification training.  (Doc. 30-8 at 57:5–59:19; *see also* Doc. 30-11 at 13:17–25, 14:12–16).  Bischoff, on the other hand, had been working on boilers for over twenty-five years and had been a USRO at the Lake City VA Hospital for over five years.  (Doc. 30-7 at 2).  Thus, accepting the "mere fact" that Bischoff was treated differently than Wilson and Bell does not allow the Court "to infer that unlawful discrimination played any part in the process that led to that decision."  *Rosado*, 127 F.4th at 868 (quotation omitted).  Indeed, as the most experienced among the three, one would expect Bischoff to have different responsibilities and assignments.  Even so, when Bischoff could not or would not complete them, Farmer would sometimes ask other USROs to assist or offer to help himself.  (Doc. 30-16 at 24, 33; Doc. 30-18 at 47–48).

Bischoff's "failure to produce a comparator does not necessarily doom [his] case," however.  *Lewis v. City of Union City* ("***Lewis II***"), 934 F.3d 1169, 1185 (11th Cir. 2019) (quotation omitted).  Rather, Bischoff can survive summary judgment by presenting "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination."  *Jimenez*, 146 F.4th at 997 (quoting *Lewis v. City of Union City* ("***Lewis I***"), 918 F.3d 1213, 1220 n.6 (11th Cir. 2019)).  This evidence may include "discriminatory comments, suspicious timing, arbitrariness in the employer's actions, pretext in the employer's rationale, better treatment of similarly situated . . . employees outside the protected group, and similar experiences by . . . employees [within the protected group]."  *Ward v. Dep't of the Navy*, No. 6:23-cv-1387, 2025 WL 1677499, at *4 (M.D. Fla. June 13, 2025) (quoting *Bell v. Sec'y, Dep't of Veterans Affs.*, No. 22-12698, 2024 WL 1462405, at *4 (11th Cir. Apr. 4, 2024)).  "[A]s a whole," this evidence must "strongly

19

suggest" that Bischoff's differential treatment was a result of Defendant's age discrimination. *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1337 (11th Cir. 2024). Bischoff does not meet this burden.

As for suspicious timing, Bischoff fails to offer specific arguments pertaining to the three personnel actions in question. He does argue that he was targeted after becoming the oldest USRO at the Lake City VA Hospital upon Monroe Jackson's detail to EMS. Likewise, he argues that Farmer hired younger USROs to replace him after his detail to EMS. To the first point, Bischoff is older than Jackson. (Doc. 30-7 at 3–4). If, as Bischoff suggests, Farmer's practice had been to target the oldest employee, he would have begun with Bischoff, rather than Jackson. Jackson, meanwhile, admits his own problems with Farmer started on "day one." (Doc. 30-15 at 9:21, 10:13–14). And while Jackson testified assuredly that Farmer discriminated against him, too, he declined to conclude that Farmer discriminated against him or anyone else on the basis of age. (*Id.* at 9:16–20, 11:14–21). His testimony—like that of the other USROs—simply describes Farmer as a poor manager unwilling to cooperate with the more-experienced employees he was tasked with supervising. (*E.g.*, *id.* at 11:4–13). Moreover, the "mere fact" that new employees were hired from "outside [of Bischoff's] protected class" does not allow the inference that unlawful discrimination played any part in the process culminating in that decision. *Rosado*, 127 F.4th at 868.

Nor does record evidence establish the suspicious timing of events after Bischoff's detail. For instance, Hassebroek, the oldest USRO following Bischoff's detail to EMS, requested a transfer after hearing a "rumor" that he would be detailed next. (Doc. 30-9 at 27:9–11). But Hassebroek, who was never detailed to EMS, and never the subject of

20

a disciplinary investigation involving the apparent mishandling of equipment, disclaims any certainty in his rumor-based fear, and his transfer was quickly granted. (*Id.* at 27:8–14). Moreover, Hassebroek's problems with Farmer preceded Bischoff's detail. As with Jackson, they began on "[d]ay one." (*Id.* at 12:5–6). And while Hassebroek asserts that his issues with Farmer were age-related, he fails to substantiate the suspicion. Rather, Hassebroek's testimony describes Farmer as a poor and unknowledgeable manager unwilling to take the advice of his more experienced employees. (*See, e.g.*, *id.* at 42:10–25).

As for the arbitrariness of Farmer's actions and the relevant experiences of employees inside and outside of Bischoff's protected group, the evidence shows that every USRO had issues with Farmer. That is not to say that Farmer treated them equally, but USROs ages 54–58 were treated either better or worse than one another without regard to the relative ages among them. (*Compare* Doc. 30-12 at 16:16–18, *with* Doc. 30-7 at 5, 7). Farmer's treatment of USROs did, however, correlate with whether the USROs predated his position as manager. (*E.g.*, Doc. 30-12 at 17:16–19). Such is understandable, as a new "supervisor[] may impose different standards of behavior, and a new supervisor may decide to enforce policies that [were not previously] consider[ed] important." *Rojas v. Florida*, 285 F.3d 1339, 1343 (11th Cir. 2002). That appears to be exactly what happened when Farmer became supervisor—he "wanted to do [things] his way." (Doc. 30-15 at 11:8; *see also* Doc. 30-10 at 26:19–20). None of the USROs much appreciated it, and all seemed to have had issues with Farmer that began prior to and extended after Bischoff's detail. (Doc. 30-9 at 8:4–9, 11:24–12:6, 19:8–12; Doc. 30-10 at 24:10–25:13; Doc. 30-11 at 14:25–15:10, 19:1–24; Doc. 30-12 at 10:13–15, 11:11–13,

15:17–23; Doc. 30-17 at 10:9–10, 10:25–11:3).  However, Bischoff and others that "had maintained the operation of th[e] plant for two to three years on their own without a supervisor" were most affected.  (Doc. 30-12 at 17:18–19).  That does not, however, strongly suggest that Bischoff suffered age-based discrimination.

As for pretext, Bischoff's detail letter indicated that he was being investigated, in part, for his failure to follow instructions and his possible intentional damage of VA equipment—two sump pumps at the Lake City facility.  Bischoff argues that the disciplinary investigation on which his detail to EMS was founded was, in fact, based on his age.  However, he once again offers general allegations of disparate treatment to support his argument.  Once again, the problem is that Famer's treatment of USROs did not correlate strictly with age; Bischoff's treatment may have resulted from his outsized work experience, his refusals to follow instructions, or his proclivity for arguing with superiors.  (*See* Doc. 30-6 at 8–9, 19; Doc. 30-16 at 39; *see also generally* Doc. 30-26).  Sometimes, it appears to have resulted directly from improper actions that he had taken or had appeared to take.  (Doc. 30-6 at 8–9, 12; Doc. 30-18 at 13–16).  Sometimes, he was simply asked to perform tasks that had been assigned to but not been completed by other USROs on previous shifts.  (*E.g.*, Doc. 30-7 at 4.  *But see* Doc. 30-16 at 33 (Farmer asking all other USROs to perform task that Bischoff had not completed)).  Moreover, the record firmly establishes that the sump pumps in question were a frequent point of contention between the USROs, regardless of age, and management, primarily Farmer.  (*See* Doc 30-10 at 19:15–25, 24:10–18; Doc. 30-11 at 15:2–16, 17:23–18:3).  Perhaps, as several testified, Farmer did not know how best to deal with the problem, or with the boiler plant generally.  (*See* Doc. 30-9 at 42:10–25, 66:6–67:3; Doc. 30-15 at 11:4–13,

22

20:15–25; Doc. 30-17 at 10:25–11:3).  Still, Farmer's concern over the floundering pumps is well established in the record, and Bischoff offers nothing suggesting that Farmer's real concern was Bischoff's age, rather than his handling of the pumps.  Therefore, Bischoff fails to show that Defendant's proffered reasons for his investigation and detail were pretextual.  *Cf. Poer*, 100 F.4th at 1336 ("A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (quotation omitted)).

The voluminous record in the case can be summed up as follows: the USROs and Farmer "would [often] complain about each other.  They weren't getting along.  [Farmer] wasn't getting along with them.  They weren't getting along with him."  (Doc. 30-10 at 24:15–18).  Some dispute that age factored into this tension.  Bischoff, however, believes it did.  In support of his position, he has presented evidence of disparate treatment.  He presented evidence of being assigned tasks that posed him apparent safety concerns.  He presented evidence showing that he would be reprimanded or written up after he provided explanations for not completing tasks.  He presented evidence showing that he would be reprimanded even after he perceived himself to have complied with work assignments, some of which were admittedly unclear.  But as to the "ultimate question"— "whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination," he comes up short.  *Jimenez*, 146 F.4th at 997 (quoting *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023)).  Because Bischoff has neither shown a prima facie case of age discrimination nor supplied a convincing mosaic of circumstantial evidence showing that this treatment was tainted by age discrimination, Defendant is entitled to summary judgment on Count I.

23

## C. Retaliation

Like discrimination, retaliation claims are governed by § 633a(a).  *See Rosado*, 127 F.4th at 876 ("[The Eleventh Circuit has] long held that 'discrimination,' as [the ADEA's] federal-sector provision employs the term, includes retaliation.").  Thus, "retaliation for engaging in protected conduct under . . . the ADEA must not play any part in any federal personnel action." *Id.* (quotation omitted).  A plaintiff may survive summary judgment on a retaliation claim by establishing that "(1) he engaged in statutorily protected expression (here, an activity that . . . the ADEA protects); (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Id.* (citing *Buckley*, 97 F.4th at 798).  Unlike in discrimination claims, the Eleventh Circuit has expressly held that "making out a prima facie case at step one of the *McDonnell Douglas* framework defeats summary judgment on a federal employee's retaliation claim." *Id.*

Defendant does not contest that Bischoff engaged in statutorily protected expression.  As to the second prong, Bischoff must show a materially adverse action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Buckley*, 97 F.4th at 799 (quotation omitted).  He argues that his investigation and detail to EMS, his delayed transfer request, his bar on overtime pay, and his suspension constituted adverse acts.  For the reasons previously explained, the Court will consider only Bischoff's investigation and detail.

Bischoff argues that causation between his contact with the EEOC and subsequent detail to EMS may be inferred because the events were close in time.  Indeed, "[a] causal connection may be inferred when there is a close temporal proximity between the

24

protected activity and the adverse action." *Greene v. Ala. Dep't of Revenue*, 746 F. App'x 929, 932 (11th Cir. 2018) (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). "But mere temporal proximity, without more, must be very close." *Id.* (quotation omitted). Here, Bischoff first contacted the EEOC's Office of Resolution Management early in September 2022. He was detailed to EMS about forty days later. Assuming that a forty-day period establishes a very close temporal proximity between the two events, *cf. Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999), Bischoff still fails to establish a causal relationship between the events. First, because Bischoff presents no evidence suggesting that Farmer, Dwyer, or any other superiors knew that he contacted the EEOC in September 2022. To the contrary, Dwyer testified that he did not become aware of Bischoff's contact with the EEOC until *after* he had detailed Bischoff to EMS, which he did *before* Bischoff filed a formal EEOC complaint. (Doc. 30-13 at 45:16–46:5). Without conflicting evidence, the Court has no basis for finding a causal connection between Bischoff's protected activity and his detail to EMS. *See Singleton v. Pub. Health Tr. of Mia.-Dade Cnty.*, 725 F. App'x 736, 738 (11th Cir. 2018) (finding causation lacking where plaintiff failed to show "that both the decision-maker responsible for each alleged adverse action had knowledge of his protected activity and the decision-maker's knowledge was acquired in close temporal proximity to the adverse action"); *Jones-Gooch v. Brennan*, No. 3:18-cv-1066-J, 2019 WL 3084725, at *5 (M.D. Fla. Apr. 30, 2019) ("Plaintiff has not plausibly alleged such a causal connection because Plaintiff fails to . . . allege that [her supervisor] was aware of Plaintiff's contact with the EEO Counselor."), *report and recommendation adopted*, 2019 WL 3082953 (M.D. Fla. July 15, 2019).

Second, even if Bischoff's superiors knew about his contact with the EEOC, "the intervening discovery of employee misconduct can sever the causal inference created by close temporal proximity." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023). Here, there are two relevant instances of alleged employee misconduct: (1) Bischoff's alleged tampering with the sump pumps; and (2) Bischoff's painting of an LED light and apparent refusal to remove the paint.[7] Of course, Bischoff argues that the fallout from these events was a pretext for discrimination. But as already discussed, while the record suggests that Farmer may have lacked the knowledge or experience necessary to make the most out of the VA's inadequate sump pumps, it does not suggest that Dwyer's investigation into Bischoff's handling of the pumps was pretextual. Nor does the record reflect that any age discrimination tainted the decision to investigate or discipline Bischoff after he painted an LED light without permission. Accordingly, Bischoff fails to show a causal connection, based on temporal proximity, between his protected activity and his detail to EMS. Defendants are therefore entitled to summary judgment on Count II.[8]

## IV. CONCLUSION

For the reasons set forth herein, it is **ORDERED** and **ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 26) is **GRANTED**. The Clerk is directed to enter judgment in favor of Defendants, and against Plaintiff, on Plaintiff's claims. Thereafter, the Clerk shall terminate all pending motions and close this case.

---

[7] Bischoff swore that he removed the paint. (Doc. 30-7 at 11). Farmer testified that he tasked painters to remove it after Bischoff refused. (Doc. 30-14 at 86:2–15). E-mails sent between the two corroborate Farmer's testimony. (*See* Doc. 30-18 at 17–25).

[8] The Court declines to address the parties' arguments regarding whether Bischoff improperly relied on an exhibit he did not produce in discovery because the exhibit is not at issue in this ruling. (*See* Doc. 30-21).

**DONE AND ORDERED** in Jacksonville, Florida on March 18, 2026.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

27